24 C.C.P.A.(Patents)

## KIRSCHBRAUN v. DOHERTY.
### Patent Appeal No. 3798.

Court of Customs and Patent Appeals.
May 29, 1937.

See, also, Doherty v. Dubbs (Cust. & Pat.App.) 65 F.(2d) 151.

Charles M. Thomas and Clarence O. McKay, both of Washington, D. C., for appellant.

Edmund G. Borden, of New York City, for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

An interference proceeding was instituted in the United States Patent Office between the application of Lester Kirschbraun, for certain improvements in apparatus and process for treating hydrocarbon oils, filed April 1, 1920, and a pending application of one Henry L. Doherty, filed February 24, 1920, for a similar invention. There were originally five counts in the interference. Count 1 of the interference, as now before us, is the only remaining count which was in the original interference as count 3 thereof. Counts 2 and 3 of the present interference were added on the suggestion of the party Doherty. All three of the present counts originated in the Doherty application.

The three counts of the interference are as follows:

"1. A process of distilling oil comprising heating a heavy hydrocarbon oil under pressure to a cracking temperature while it is being circulated in a stream, discharging the heated oil into an enlarged chamber while maintaining the pressure therein to separate vapors from the oil, continuously leading the vapors and the oil in separate streams from the chamber into a body of oil maintained at a cracking temperature and pressure, bringing the vapors into direct contact with the oil of the body and leading off vapors from the body and condensing them.

"2. A continuous process for cracking hydrocarbon oils, which comprises heating the oil in a confined stream of restricted cross section in a cracking zone, passing cracked oil from said zone through successive vapor releasing chambers of decreasing temperature and pressure, passing vapors released in a chamber of higher temperature through and in intimate contact with liquid oil in the next succeeding chamber of lower temperature, and withdrawing and condensing vapors from the chamber of lowest temperature.

"3. The process of cracking hydrocarbon oils which comprises, heating the oil to be cracked to a cracking temperature in a confined stream of restricted cross section in a heating zone, passing heated oil from said zone through successive vapor releasing zones of decreasing temperature and pressure, passing vapors released in each vapor releasing zone except the last, into the next succeeding zone of lower temperature in contact with liquid oil constituents therein, subjecting vapors remaining uncondensed in said zones to dephlegmating conditions to produce reflux condensate, passing reflux condensate produced by said

dephlegmatic conditions to said heating zone for retreatment, and producing a final condensate from the vapors removed from the last vapor releasing zone."

The junior party Kirschbraun filed a motion to dissolve the interference on the ground that the Doherty application fails to disclose or teach the invention defined by the counts and will not support said counts.

The senior party Doherty moved to dissolve the interference on the grounds: First, on account of irregularity in its declaration; second, that the Universal Oil Products Company, the assignee of the junior party Kirschbraun, had waived its rights by failure to move to amend in interference No. 55,846 (Doherty v. Dubbs) and insert the counts of this interference in said interference; third, that the junior party's aforesaid assignee is estopped by its failure for more than two years after knowledge thereof to copy the then allowed claims 3, 4, and 5 from the senior party's application; fourth, that the junior party has no right to make counts 1 and 2 because of failure to disclose the subject-matter defined by these counts, namely, and particularly, that it does not disclose the passage of "all of the cracked oil" and "all vapors." (Italics ours.)

The Examiner of Interferences sustained the Kirschbraun motion to dissolve as to counts 1 and 2 of the interference, and overruled it as to count 3, which was made, thereafter, count 1. The Doherty motion to dissolve was overruled in toto. Doherty's motion to add proposed counts 6 and 7 was allowed and these were added as new counts 2 and 3. The interference was dissolved as to counts 4 and 5 on the motions of both parties. The interference was then reformed with three counts as they are now before us.

On final hearing, the Examiner of Interferences awarded priority as to all counts to the senior party Doherty. On appeal, the Board of Appeals affirmed the decision of the Examiner of Interferences.

The matter comes to us on the appeal of the junior party Kirschbraun, and a number of questions are raised which will require a rather extended survey of the record. Both parties took evidence as to priority of conception and reduction to practice.

The counts now in the interference are each for process.

The application of the senior party discloses a process for distilling heavy hydrocarbon oils. The product desired to be obtained is lighter hydrocarbon oils, particularly gasoline, and other fractional distillates. The invention contemplates rapidly circulating heavy oil through a heater in a comparatively small stream and carrying a stream of vaporizing and agitating inert gas in contact and parallel with the oil while it is being heated. The system inherently embraces the circulation of vapors and oil through a cracking chamber in countercurrent paths, thus bringing the vapors and oil in constant contact with each other. In order to effectively promote this process, the inventor passes the raw oil through a series of surface condensers where it receives heat from oil vapors which flow through the condensers countercurrent to the flow of oil. The oil is thus preheated by the vapors to from 300° to 450° F. and from the last of the condensers flows into the upper portion of a cracking chamber. This cracking chamber is an elongated tower with a conical base for the reception and collection of liquids, and the incoming oil flows downward through this cracking tower over a series of shallow pans or baffles from top to bottom of the chamber. The specification states, in part: "In the cracking chamber, the oil is formed into a series of bodies which are separated by trays or horizontal partitions." As this oil passes downward, it meets a body of heated oil about one-third of the way downward through the cracking chamber. This heated oil enters through a pipe by means of a pump from a chamber or a separator, in which oil from the still is separated into oil and vapors. As the downflowing liquid proceeds in its course, near the bottom of the cracking chamber it meets an inflowing current of heated gases which comes from the same separator. These gases are at a cracking temperature and move upward through the cracking chamber, meeting the downflowing oil. The trays are so arranged with small openings that the gases, in ascending, will bubble through the oil passing thereover. The downflowing liquids are therefore commingled with gases and after this intermixture the liquids are drawn off at the bottom and again sent back through the still for reheating. The gases which escape in the cracking chamber ascend, pass through the surface condensers, and the condensate is removed from the system by

proper apparatus. As to the rising gases in the cracking chamber, the specification states, in part: "In this way, the gas and vapors entering through the pipe 48 pass upwardly through the bodies of oil on the trays to actively agitate the oils and to transfer to the oil any superheat which they may possess."

The disclosure of the junior party is, briefly, in part, as follows: The material to be treated, namely, heavy hydrocarbon oil, is caused to pass through a series of separate retorts. The raw oil is pumped into a furnace and through a series of small cracking tubes therein, from which it goes to a series of retorts, four being shown in the drawings. The oil is caused to pass through each retort before it enters the next in the series. As this oil, heated to cracking temperature, is discharged into the first retort, some separation of vapors and fluids results, and the vapors rise through the body of oil and leave the retort at the top, from thence entering a dephlegmator above the retort from which the condensate returns for recirculation and the uncondensed vapors pass by means of a pipe into the next retort in the series, from which pipe, by means of perforations it is discharged into the condensate therein. From the first retort a stream of oil passes into the next retort where it again is brought into contact with a large body of oil and gases, and again the preceding process is repeated. Oil is drawn from each of these retorts by a standpipe, the level of the outlet of the standpipe being higher in each succeeding retort, thus retaining the condensate at a somewhat higher level. The lower part of the vapor injector pipe in each retort is perforated, permitting the vapor to be diffused in small streams through the condensates. This process is repeated in each retort until the series is completed. The object of this process is to keep vapors constantly passing into and through large bodies of oil heated to cracking temperature, thus bringing in constant contact the oil and vapors, and to increase the quantity and quality of the residual distillate.

The first and most important question to be determined in this case is whether the first count of the interference will read on the disclosure as made by the respective parties and, as it seems to the court, the principal point involved here is as to whether the applications of the parties disclose this element, namely, continuously leading the vapors and the oil in separate streams from the chamber "into a body of oil." (Italics ours.) Counsel for the junior party insist that the Doherty disclosure does not satisfy this requirement, while the disclosure of the Kirschbraun application does.

It seems quite apparent that the apparatus of the respective parties, while intended to produce the same result, does not operate in the same manner. The count says, "a body of oil" (italics ours), as we have already shown. Doherty's application states that the oil is formed into a series of bodies and the "bodies of oil on the trays."

We find ourselves in agreement with the contention that the Doherty application shows rather an upflowing stream of gas and heated oil in contact with a downflowing stream of inflowing oil rather than two currents, one of oil and one of gas, entering a body of oil. The amounts of oil and condensate borne upon the various trays of Doherty are "bodies," it is true, however small they may be, but it is more in keeping with the language of the count that the body of oil which is in mind in the formation of the count is one considerable body, such as is shown in the disclosure of Kirschbraun.

It will also be noted that count 1 calls for the maintenance of "a cracking temperature and pressure" during the process of intermingling of the vapor and body of the oil. It appears quite plainly that in the Doherty application and disclosure, this language is not satisfied. During at least one-third of the flow of the oil in the upper portion of the cracking chamber, the incoming oil is not at a cracking temperature, but it gradually increases in temperature as it proceeds downward, with a consequent evident variance in temperature and pressure.

It also appears that the heavy hydrocarbon oil mentioned in the beginning of the count is the oil before treatment. It will be observed that the count recites, "heating a heavy hydrocarbon oil under pressure to a cracking temperature while it is being circulated in a stream, discharging the heated oil into an enlarged chamber * * * to separate vapors from the oil." Consideration of the specification and drawings discloses that the heavy hydrocarbon oil in Doherty is not discharged into a chamber and into a cracking temperature. As a matter of fact, it is discharged into much less than a cracking temperature. The temperature only becomes a cracking

one after a part of the journey of the oil through the cracking chamber is finished.

■ We are compelled, therefore, to differ with the Patent Office tribunals as to count 1 of the interference. In the judgment of the court, this count does not read upon the Doherty disclosure and the interference should have been dissolved as to said count.

· It is not contended here that Doherty cannot make counts 2 and 3, and Kirschbraun's motion to dissolve, as to them, was, therefore, properly overruled.

The party Doherty claims in his motion to dissolve that the party Kirschbraun is estopped to make the counts of the interference, because of the failure of his assignee to claim the same in interference No. 55,846. In view of our conclusions that the interference should be dissolved as to count 1, and in view of our conclusions as to priority as to counts 2 and 3, hereinafter stated, we deem it unnecessary to here further discuss Doherty's said motion to dissolve.

■■ The remaining question which we find it necessary to determine is that of priority as to the subject-matter of counts 2 and 3. Doherty is the senior party, and the burden, therefore, rests upon Kirschbraun to overcome Doherty's priority by a preponderance of the evidence. This he attempted to do by his testimony that he conceived the invention in October, 1919, after witnessing a demonstration of a small plant erected by C. P. Dubbs, at Wilmette, Ill. He testified that he disclosed his invention to Frank L. Belknap, a patent attorney of Chicago representing his assignee, while upon a train traveling east from Chicago, drawing a rough sketch at that time. This rough drawing, known as Kirschbraun's Exhibit No. 1, is in evidence. Mr. Belknap, who was deceased before the evidence was taken herein, examined the drawing and wrote thereon: "Explained to me by L. Kirschbraun, December 1st, 1919, en route to Washington, D. C., on 'Broadway,' as process and apparatus for treating hydrocarbons. F. L. Belknap."

It sufficiently appears from the record that the memorandum and the signature attached thereto is in the handwriting and the signature of F. L. Belknap. It also appears that one Thomas E. Schofield, a patent lawyer, was associated with Belknap at that time, and that a part of his duties included the preparation of patent applications for clients. By stipulation of the parties, it is stated that if Schofield were present he would testify as follows: "That if Thomas E. Schofield were called as a witness in this interference he would testify that he began the preparation of the Kirschbraun application involved in this interference on or about February 3d, 1920, and that he completed a draft of an application on or about February 6th, 1920, describing substantially the same subject matter as that of the application as filed and that the entries on the said record sheets hereto attached as exhibits A and B under the dates of February 3rd and February 5th, 1920, have reference to the preparation of the said application of the party Kirschbraun involved in this interference."

Also included in this stipulation are certain memoranda showing charges for work done on the Kirschbraun application by Belknap from February 3 to 6, 1920, and charges for the expenses of the train trip mentioned in the testimony of Kirschbraun, in December, 1919.

Exhibit 1 is a sheet of scratch pad paper with a rough pencil sketch thereon. It bears a general resemblance to the final sketch accompanying the application. A few of the parts are lettered, but much is left unexplained and it lacks a great deal of the precision required of a sketch from which construction could be made. The evidence which was offered as to the memorandum of Mr. Belknap seems to have justified its admission.

We cannot escape the conviction that this evidence offered on behalf of Kirschbraun lacked the certainty necessary to overcome Doherty's filing date. We do not, however, approve the view that this evidence so offered on behalf of Kirschbraun is "of no weight in view of the failure to submit the said completed draft."

We have examined the record evidence offered on behalf of Doherty on the question of the priority of conception. Without going into detail, it appears quite plainly from the testimony of David G. Brandt, Robert G. Griswold, Frederick E. Alexander, and Edmund G. Borden, that some time in the summer of 1919, the party Doherty was in possession of the invention, the subject-matter of the issue here, as stated in counts 2 and 3; that full and complete plans of the same were made by the witnesses Brandt and Alexander, under the direction and with the approval of the party Doherty; that Mr. Borden, a patent at-

torney representing the party Doherty, was retained and employed at work on these plans and was in continuous consultation with the employees of the party Doherty during the summer of 1919, on the matters now involved herein. In fact, a consideration of the testimony in this record shows conclusively that the invention here involved was conceived and fully disclosed by the party Doherty and those under his immediate employ at least as early as the summer of 1919, many months before the conception of the party Kirschbraun, even if he be given the date when he claims to have disclosed the same to Mr. Belknap, on the train.

Kirschbraun does not attempt to prove a reduction to practice prior to his date of filing. It therefore appears that, as to counts 2 and 3, Doherty was the first to conceive and the first to reduce to practice, allowing to him only the date of filing as his date of reduction to practice. Doherty is, therefore, entitled to priority as to counts 2 and 3.

The decision of the Board of Appeals of the United States Patent Office is, therefore, modified, being affirmed as to counts 2 and 3 and reversed as to count 1.